CLIFFS CHEMICAL COMPANY, Appellant, vs. WISCONSIN TAX COMMISSION, Respondent.

*April 5—June 20, 1927.*

*Taxation: Device to evade taxation: Corporation selling output to stockholders at cost: True taxable income:· How determined: Action to review tax.*

1. The courts will scrutinize closely any attempt to evade taxation, to see whether the action is *bona fide* or fictitious.  p. 301.
2. Where a corporation, in order to evade income tax, adopted the method of distributing profits in kind, instead of in money, to its two sole corporate stockholders at cost, thereby eliminating taxable income, the court will look behind the scheme to the substance of the transaction; and in this case the tax commission properly assessed the income tax on the basis of the

value of the goods distributed, which could be readily ascertained by proper accounting principles, in application of the principle that that is certain which can be made certain. pp. 301, 302.

3. Sec. 71.25, Stats., providing that, if a corporation conducts its business in such manner as to create a loss or improper net income, the tax commission may determine its true taxable income, merely directs the commission to conform to a method which it would have been bound to adopt without the act, and, even if applied retroactively, the statute would not be unconstitutional on that ground. p. 302.

4. The use of the word "may" in said sec. 71.25 did not indicate an intention on the part of the legislature to lodge judicial and legislative discretion in the tax commission; and since the statute is for a public purpose, to secure the proper tax, the word should be construed as mandatory and to mean "shall." p. 302.

5. Taxes are obligations of the highest character, and payment alone discharges the obligation thereof; and until payment the state may proceed by all proper means to compel the performance of the obligation. No statutes of limitation run against the state, and it is a matter of discretion with the state to determine how far into the past it will reach to compel performance of the obligation to pay a tax. p. 303.

6. Sec. 71.155, Stats., providing that in an action to review an assessment by the tax commission the court shall disregard any irregularity, informality, or omission, and shall enter an order confirming the assessment unless substantial injustice has resulted therefrom, makes the action before the circuit court equitable in its nature. p. 304.

APPEAL from a judgment of the circuit court for Dane county: AUGUST C. HOPPMANN, Circuit Judge. *Affirmed.*

This is an appeal from a judgment confirming an order of the *Wisconsin Tax Commission* levying additional income against the appellant for the years 1917 to 1924, inclusive.

For the appellant there was a brief by *Andrews & Belden* of Cleveland, Ohio, and *North, Parker, Bie & Welsh* of Green Bay, and oral argument by *William P. Belden* and *B. L. Parker.*

For the respondent there was a brief by the *Attorney General* and *Franklin E. Bump,* assistant attorney general, and oral argument by *Mr. Bump.*

CROWNHART, J.    A concise statement of the facts involved in this case is found in the findings of fact of the *Tax Commission,* as follows:

"(1) In its 1917 return of income, the company deducted under the caption of 'Other Ordinary and Necessary Expenses,' the sum of $84,789.30 as 'War Tax.' This deduction was allowed in the original assessment. There is nowhere in the return any information which represents this sum to be an accrued tax. The balance sheet did not disclose this accrual, nor was the word 'accrued' used in describing the tax.

"From the report of its auditor, the *Commission* now finds that this tax was not paid in 1917, and not even all of it in 1918, that the sum represented an estimated war tax on 1917 income, and that the full sum deducted was never paid to the government, but was reduced before final settlement. The *Commission* did not have all of the facts when it made its original assessment, and if the *Commission* had had the facts from which it could have ascertained the true nature of this deduction, this amount of tax would not have been allowed as a 1917 deduction.

"(2) The *Cliffs Chemical Company* is a corporation organized in 1912 under the laws of this state. It was formed by the Goodman Lumber Company and the Cleveland-Cliffs Iron Company, they owning, respectively, 28 % and 72 % of the capital stock. The Cleveland-Cliffs Iron Company is a foreign corporation and the Goodman Lumber Company is a domestic corporation.

"At the time of the organization of the *Chemical Company* the Goodman Lumber Company owned and operated a sawmill plant at Goodman, Wisconsin, and produced a considerable amount of slabs, edgings, and cordwood of a character suitable for distillation purposes, which would be wasted if not used.

"The Cleveland-Cliffs Iron Company was desirous of securing an additional supply of charcoal for use as fuel, and of crude alcohol and acetate of lime for refining purposes.

"These two companies entered into a series of contracts, the result of which was the formation of the *Cliffs Chemical Company.* This company was located at Goodman, Wisconsin, and the Goodman Lumber Company agreed to fur-

nish it with a regular supply of seasoned wood at a stipulated price per cord.   In addition the Goodman Lumber Company agreed to furnish the new company with sufficient power and light, for which it was to be reimbursed.

"The Cleveland-Cliffs Iron Company agreed to purchase the entire output of the plant at prices based upon market prices of finished products.   For example, the price to be paid for charcoal was four cents per bushel when pig iron was $13.50 or less per ton, f. o. b. furnace; and the basic price of four cents per bushel advanced one-half cent per bushel with each $1 increase in the market price of pig iron. Crude alcohol was purchased from the company upon another scale.   For 82 % wood alcohol the Iron Company paid 56 % of the minimum price per gallon of 95 % refined alcohol, as quoted at the date of delivery in the publication known as 'The Oil, Paint and Drug Reporter.'   If the crude alcohol which was delivered had a greater percentage than 82 % the basic price was to be adjusted.   The price to be paid for acetate of lime was determined by the market price in New York less freight and also less 3 %.   This price was to be the same as the *Cliffs Chemical Company* would receive if it sold its product net at Goodman through a certain New York agency specified in the contract.

"The *Cliffs Chemical Company* started business in 1913 under these contracts.   For the years 1913 to 1917, inclusive, its operations were successful, there being a loss only in the year 1914.   During this period of time substantial dividends were declared and its income was reported to and assessed by the state of Wisconsin.

"Early in 1918 the stockholders effected a radical change in the character of the organization.   At that time the by-laws were amended and the following resolution was adopted:

"'Resolved, That the by-laws of this company be and they hereby are amended by adding thereto a new by-law as follows, viz.:

"'Article XXIV.

"'That from and after the first day of March, 1918, each stockholder of record shall be entitled to receive, each year, such a proportion of the products produced by the company, f. o. b. cars at Goodman, Wisconsin, at actual cost of production, as the stock held by each bears to the entire issued

stock of the company then outstanding; it being under-
stood that such stockholder shall pay in cash to the company
on or before the tenth day of each month, for the products
so delivered to him during the month preceding, the actual
cost of said products based upon an equitable and lawful
accounting.

" 'Be it further resolved, That it is agreed by all of the
stockholders of the company, present and prospective, that
this by-law shall not be amended, annulled, changed, or
modified in any way except with the unanimous consent of
all the stockholders of the company.'

"At the same meeting the officers were authorized and in-
structed to secure modification or cancellation of the sales
contracts or other agreements conflicting with the by-laws as
amended.

"Since the passage of this by-law the stockholders have
taken the entire product of the company at its cost of pro-
duction, the Cleveland-Cliffs Iron Company receiving 72 %
and the Goodman Lumber Company 28 %. The *Cliffs
Chemical Company* reported no taxable income in the re-
turns filed for the years from 1918 to 1924, inclusive. The
income items exactly equaled the deduction items on these
returns, and no net income was shown for the reason that
the entire product of the company was turned over to the
stockholders at cost.

"According to the by-laws as amended, the Goodman
Lumber Company was to receive 28 % of the products
manufactured by the *Cliffs Chemical Company,* but it had no
immediate use for them. The Cleveland-Cliffs Iron Com-
pany thereupon agreed to purchase these products from the
Goodman Lumber Company and pay for them at the same
scale of prices which were in effect previous to the amend-
ment of the by-laws of the *Cliffs Chemical Company.*

"Beginning with the year 1918 the Goodman Lumber
Company erroneously reported for taxation the profit which
it derived from the sale of its share of these products; how-
ever, the *Commission* is accordingly reducing the taxable
income of the Goodman Lumber Company for the years in-
volved.

"The Cleveland-Cliffs Iron Company filed no returns of
income from 1918 until 1921. In the year 1921 it was
licensed to transact business in Wisconsin, and began the

operation of a coal dock at Green Bay. It has apparently returned for taxation the income from its operations at Green Bay; but has not reported any profit on its share of *Cliffs Chemical Company* product.

"The auditor's report disclosed the prices received by the Goodman Lumber Company from the Cleveland-Cliffs Iron Company for the former's share of the *Cliffs Chemical Company's* product. Working from these figures, the *Tax Commission* was able to determine the net gain derived by the Goodman Lumber Company from its share. Since the Goodman Lumber Company received only 28 % of the product, the net gain received by it was treated by the *Commission* as representative of only 28 % of the net gain accruing by the *Cliffs Chemical Company* from the manufacture of its products. The total gain was thereupon computed as set forth in the audit report accompanying the preliminary assessment notice.

"(3) Inasmuch as the *Cliffs Chemical Company* sold all of its product from 1913 to 1918 to the Cleveland-Cliffs Iron Company, and since it distributed its product among its two stockholders from 1918 to 1924, it was never called upon to establish and maintain a sales organization. In view of the fact that the *Chemical Company* received its cost of production immediately upon delivery of its products to its stockholders, it did not have to borrow money with which to carry open accounts; and consequently it paid no interest and suffered no losses from bad debts. There is evidence which tends to show that the Iron Company took part in the management of the *Chemical Company* and that the Iron Company received from the *Chemical Company* the sum of $3,000 a year for managerial services rendered. This charge was agreed upon in 1912 when the *Chemical Company* was organized."

The appellant frankly admits that the change in its method of distribution of its earnings in 1917 was for the purpose of escaping the burdensome income tax being levied by the federal government, and it appears in that it has been successful. It fairly may be assumed that appellant had in mind the same purpose as to the state income taxes. As to whether the appellant's method to accomplish that result is

legal, is the question on this appeal.  If legal, no matter how devious the method the appellant may not be criticised.  If the method was illegal, the appellant must suffer the penalties provided by law for the attempted evasion.

The appellant's main contention is that after its change in method of distribution of its products it had no income. The company had only two stockholders and they both agreed to the change which resulted in the same profits to such stockholders as before the change, without deduction of income taxes and without declaration of dividends by appellant.  Had there been other stockholders in appellant company, who had not agreed to the change of method, and they, by reason of such change, had suffered loss by reason of appellant having no income as claimed, would they have been remediless?  We think not.  They would have had the right to compel an accounting.  Such a proceeding would have been based on profits earned by appellant, and such profits properly could have been ascertained in the same manner as they were ascertained by the *Tax Commission*. Appellant's two corporate stockholders would not have been permitted to have secured by collusion with appellant all the profits earned by appellant company to the exclusion of other stockholders.  The courts will scrutinize closely any attempt to evade taxation, to see whether the action is *bona fide* or fictitious.  *Will of Heymann,* 190 Wis. 97, 104, 208 N. W. 913.  The change of method of distribution of profits by the appellant and its stockholders was not of the substance.  It was a scheme to evade its just taxes, and this court looks behind the scheme to the substance of the transaction.  In doing so the court finds, as did the *Tax Commission,* that the profits of the appellant were the same after the change as before.  The distribution of profits after the change was in kind—in goods—instead of in money.  The value of the goods was readily ascertained by the *Tax Commission* and the income of appellant was thereby fixed with

certainty.   The appellant claims that the income found by
the *Tax Commission* is a theoretical income and not an
actual income.   In law that is certain which can be made
certain.   The income of the appellant was made certain by
the application of correct principles of accounting and the
tax thus ascertained.

The appellant contends that sec. 71.25, Stats., should not
be applied retroactively, and if so applied it is unconstitu-
tional.   This section, enacted in 1925, reads as follows:

"71.25 When any corporation liable to taxation under
this act conducts its business in such a manner as either di-
rectly or indirectly to benefit the members or stockholders
thereof or any person interested in such business, by selling
its products or the goods or commodities in which it deals
at less than the fair price which might be obtained therefor,
or where a corporation, a substantial portion of whose
capital stock is owned either directly or indirectly by an-
other corporation, acquires and disposes of the products of
the corporation so owning a substantial portion of its stock
in such a manner as to create a loss or improper net income,
the commission may determine the amount of taxable income
of such corporation for the calendar or fiscal year, having
due regard to the reasonable profits which but for such ar-
rangement or understanding might or could have been ob-
tained from dealing in such products, goods or commodities."

The legislature, in passing the law, merely directed the
*Tax Commission* to conform to a method which would have
been their duty to adopt without the act.   But even if applied
retroactively, the statute would not be unconstitutional on
that ground.   *State ex rel. Globe Steel Tubes Co. v. Lyons,*
183 Wis. 107, 121, 123, 124, 197 N. W. 578.

The appellant also contends that sec. 71.25 is unconstitu-
tional because, by the use of the word *may* instead of *shall,*
it attempted to lodge judicial and legislative discretion in
the *Tax Commission,* citing the *Globe Steel Tubes Co. Case,*
*supra.*   In that case the legislature, by amendment, had
changed the word *shall* to *may,* and it was evident that the

legislature had thereby expressed a clear intent to do so. Here no such intent is apparent. The legislature evidently intended to leave the facts to be found to the *Commission.* The statute should be given a meaning consistent with its constitutionality, if such meaning may be fairly spelled out of the language used. We think the legislative intent is not in serious doubt. The statute is for a public purpose, to secure the proper tax under the facts enumerated. The word *may,* therefore, should be construed as mandatory and to mean *shall. Brawley v. Mitchell,* 92 Wis. 671, 66 N. W. 799; *Hart v. Godkin,* 122 Wis. 646, 100 N. W. 1057.

The device attempted to be adopted by the appellant was to distribute seventy-two per cent. of its profits to a shareholding corporation without this state, by the expedient of distributing the manufactured products direct instead of making sale thereof and then paying a cash dividend.

It should be remembered that taxes "are obligations of the highest character, for only as they are discharged is the continued existence of government possible. . . . Payment alone discharges the obligation, and until payment the state may proceed by all proper means to compel the performance of the obligation. No statutes of limitation run against the state, and it is a matter of discretion with it to determine how far into the past it will reach to compel performance of this obligation." *Florida C. & P. R. Co. v.· Reynolds,* 183 U. S. 471, 475, 22 Sup. Ct. 176. "The payment of taxes is an obvious and insistent duty." *Bankers T. Co. v. Blodgett,* 260 U. S. 647, 43 Sup. Ct. 233.

Sec. 71.155 (sec. 5, ch. 446, Laws of 1925) provides that in an action in the circuit court to review an assessment by the *Tax Commission* "the court shall disregard any irregularity, informality or omission, and shall enter an order confirming such assessment, unless it shall appear that substantial injustice to the complainant has resulted therefrom; and in all actions and proceedings to contest the validity of

any such assessment the proceedings of the commission shall be presumed to be regular and the determination of the commission shall not be impaired, vitiated or set aside upon any grounds not affecting the substantial justice of the tax." This section made the action before the circuit court in the nature of an equitable action. See *Oconto Co. v. Wisconsin .Tax Comm., post,* p. 488, 214 N. W. 445. In an early day (1861) this court considered an equitable action where the plaintiff sought to set aside a tax because of an informality of the taxing officers, where no injustice resulted. In an opinion by Mr. Chief Justice Dixon the court then said:

"The payment of taxes equitably and fairly assessed is a duty which every man is under the strongest legal and moral obligation to perform to the government which affords him protection in his person and property. Governments cannot exist without their revenues, and taxes are levied and contributions enforced upon the principle that they are but just returns for the protection and advantages derived from them. In this sense a proper tax—one which is just and correct in principle—is a debt due to the government, which the owner of the property has no more right in equity and conscience to withhold than the most sacred debt of a private nature. It is indeed, when seen in the light of reason and justice, far more sacred and obligatory, inasmuch as the considerations whence it proceeds are the highest and most inestimable rights and privileges enjoyed by the citizen. To withhold it, therefore, is a public wrong, which affects the whole community, and which cannot be justified or excused by any rule of equity or sound morality. This may be contrary to popular notions, but it is the just and enlightened view of a court of equity, which never moves except to prevent fraud and injustice, and where the relief asked conforms to the principles of rectitude and honesty. It is very well known that there are many persons whose moral perceptions are so obscure and confused, and whose selfishness is so great, that they seem to regard almost any means by which the revenues of the state may be defrauded, or moneys in the public treasury got out, as upright and honorable. One might suppose from their conduct that they considered such practices the highest evidence of public virtue and

patriotism.   Unfortunately for such projects, courts of equity take a different view; and that branch, at least, of the government against whose success and prosperity they are aimed, will, if applied to, promptly refuse its aid." *Warden v. Fond du Lac County,* 14 Wis. 618, 619, 620.

It is proper to recall this opinion at this time, as it is applicable on this appeal.   If the complainant were addressing itself to any injustice in the tax, it would have had a proper standing in the circuit court; but seeking, as it did, to evade a just tax, the court was bound to confirm the order of the *Tax Commission* as it did.

*By the Court.*—The judgment of the circuit court is affirmed.