## RICHARDSON et al. v. CONWAY et al.

District Court, W. D. Wisconsin.

Aug. 7, 1930.

Sanborn, Blake & Aberg, of Madison, Wis., for plaintiffs.

A. L. Hougen, of Manitowoc, Wis., for defendants.

LUSE, District Judge.

There is no dispute as to the facts, and both plaintiffs and defendants move for a decree upon the pleadings upon which the hearing was held.

Jurisdiction is predicated on the residence of plaintiffs in the state of Minnesota and the amount in controversy exceeding $3,000.

Prior to December 10, 1925, plaintiffs resided at Waupaca, Wis., on which date they removed to and established their residence in Minneapolis, Minn.

Prior to November 19, 1925, plaintiff Jessie P. Richardson owned all the issued capital stock of the Waupaca Electric Service & Railway Company, a public utility corporation located at Waupaca, Wis., consisting of 501 shares, and on the date last mentioned sold and contracted to sell the same to Wisconsin Valley Electric Company according to the provisions of a contract set out in full in the complaint and which is as follows:

"This agreement made and entered into this 19th day of November, A. D. 1925, by and between Jessie P. Richardson, of Minneapolis, Hennepin County, State of Minnesota, party of the first part, and Wisconsin Valley Electric Company, a corporation with its principal office in the City of Wausau, Marathon County, Wisconsin, party of the second part, witnesseth:

"That the said party of the first part has sold; assigned, conveyed, transferred and set over and by these presents does sell, assign, convey, transfer and set over to the said party of the second part for the consideration of Thirty-six Thousand Seven Hundred Ninety-one Dollars and twenty-seven cents ($36,-791.27), payment of which sum by second party to first party is hereby confessed and acknowledged, one hundred and one (101) shares of the common capital stock of the Waupaca Electric Service & Railway Company, a corporation with its principal office at the City of Waupaca in Waupaca County, Wisconsin;

"And said party of the first part does hereby promise, covenant and agree to and with second party to sell, assign and convey to the said party of the second part, and said party of the second part does hereby promise and agree to purchase, receive and pay for to the first party four hundred (400) additional shares of the common capital stock in the said Waupaca Electric Service & Railway Company for the sale and purchase prices and at the times and in the manner hereinafter particularly stated, to-wit:

"50 shares on the 19th day of May A. D. 1926, $18,213.50.

"50 shares on the 19th day of Nov. A. D. 1926, $18,213.50.

"50 shares on the 19th day of May A. D. 1927, $18,213.50.

"50 shares on the 19th day of Nov. A. D. 1927, $18,213.50.

"50 shares on the 19th day of May A. D. 1928, $18,213.50.

"50 shares on the 19th day of Nov. A. D. 1928, $18,213.50.

"50 shares on the 19th day of May A. D. 1929, $18,213.50.

"50 shares on the 19th day of Nov. A. D. 1929, $18,213.50.

"Said party of the first part hereby covenants and agrees with the said party of the second part that the said four hundred (400) shares of stock to be hereafter delivered to second party and paid for as herein stated shall be delivered to and left with the Minnesota Loan & Trust Company of Minneapolis, in Hennepin County, Minnesota, in escrow, and hereby authorizes and empowers the said Minnesota Loan & Trust Company to deliver said stock to second party in installments as aforesaid as paid for by said party of the second part, such payments to be made at the home office of said company at Minneapolis, Minnesota; and no shares of said stock to be delivered to the second party except in installments of fifty (50) shares each and no installment of fifty (50) shares shall be delivered until such installment has been fully paid for. Said party of the second part further promises and agrees with the said party of the first part to pay semi-annually to first party at the times the said several installments of stock are delivered and paid for respectively, interest upon the unpaid portion of the purchase price of the said four hundred (400) shares of stock at the rate of six percent (6%) per annum.

"The deferred payments of principal and interest hereinbefore mentioned and referred to shall be paid by the second party to the said Minnesota Loan & Trust Company, of Minneapolis, Minnesota as the agent for the first party.

"The said party of the first part hereby warrants to the said party of the second part that she is the unconditional owner of the said shares of stock, that the same are free and clear from all liens and encumbrances, and that she has good right and lawful authority to convey the same.

"Said party of the first part hereby grants to the said party of the second part the right to vote all the said stock; to-wit, said four hundred (400) shares, at any and all corporate meetings, and at all times after the date

hereof; provided however that such voting power shall be suspended at any time and revert to the first party when and so long as the second party shall be in default in any of the terms and conditions of this contract on its part to be performed.

"Said party of the first part further represents and warrants that the total outstanding accounts payable of the said Waupaca Electric Service Railway Company, exclusive of taxes assessed since January 1, A. D. 1925, and its bond issue in the principal sum of $125,000.00, did not exceed the sum of Four Thousand and Seventy-six Dollars and Ninety-seven cents ($4,076.97) on the 30th day of June, A. D. 1925, and that since said last named date no obligations have been incurred except as shown by the books and vouchers properly bookable at the date hereof occurring in the ordinary and usual course of business, and that the interest upon the said bonds has been paid to and including the 30th day of June, A. D. 1925, and that there are no contingent liabilities existing against said company at the date hereof.

"The said party of the first part further warrants and guarantees that the total outstanding capital stock of the Waupaca Electric Service & Railway Company at the date hereof does not exceed the said five hundred and one (501) shares hereinbefore mentioned; said party of the first part further represents and warrants that the total accounts receivable of the said Waupaca Electric Service & Railway Company on the 30th day of June, 1925, did amount to the sum of Eleven Thousand Six Hundred Dollars and Twenty-six cents ($11,600.26), and that said accounts are collectible, and it is agreed that second party shall exercise due diligence in collecting said accounts and that at the end of eighteen (18) months from the date hereof second party shall have the option to assign to first party all of said accounts which have not been collected and first party shall repay to second party the face thereof."

The bill also alleges the plaintiffs' theory of the legal effect of the contract, and in addition that the plaintiffs were not, during the year 1925, engaged in the business of buying or selling corporate stocks, but the purchase of such stock and the sale thereof by Mrs. Richardson was an isolated transaction. It appears also, by the answer, that Wisconsin Valley Electric Company was and is an owner and operator of large electric railway and other utility plants, had several million dollars of assets, and was abundantly able to perform its contract with Mrs. Richardson,

and that upon execution of the contract plaintiffs surrendered to the vendee the control and management of the business and property of the Waupaca Company.

The county income tax assessor of Waupaca county, in 1927, assessed the plaintiffs on their income for 1925 upon the theory that Mrs. Richardson's profit or gain upon the sale of the entire block of 501 shares was assessable income for the year 1925, which theory was adhered to on review by the county board of review and finally by the state tax commission, the defendants herein, and whether that was correct, or whether only the gain upon the sale of the 101 shares, bought and paid for in 1925, was properly assessable as income for the year 1925, is the sole question involved. If the former theory prevails, plaintiffs' assessable income for that part of 1925 during which they resided here was $103,688.79; if the latter, the figure is $20,903.

The question is therefore narrow but novel. Diligence of counsel has produced no authority directly in point, and as counsel agree that there is none, no independent search has been made.

There is no serious controversy over the proper construction of the contract. Notwithstanding vendee was not to receive delivery of any of the 400 shares of stock until after 1925 the shares were to be and were in fact deposited with the trust company in escrow to be delivered in 50-share lots upon payment of the purchase price for each lot. The obligation of vendor to sell and deliver, as well as the obligation of vendee to purchase and pay, is absolute and unconditional; there are no provisions for declaring the contract void at the election of either party in case of default by the other, save only that vendor may resume voting the stock in case of vendee's default. As just noted, the full beneficial interest in the 400 shares passed immediately to vendee. The latter agreed absolutely to pay, not only the purchase price, but interest at 6 per cent. upon the unpaid purchase price from the date of the contract. While no express mention is made of the disposition of surplus earnings, if any should be earned during the period of the contract, the provision that vendor should receive interest renders it reasonably clear that she was not to receive dividends, and whether the parties intended that no dividends should be declared during such period, or that such as might be declared should be paid to vendee, need not be determined. The effect of vendor's warranties as to the amount of

accounts payable, of stock outstanding, and of accounts receivable, has not been argued by counsel as materially affecting the rights of the parties. In fact, there is no substantial dispute but that by this contract both parties unconditionally and unqualifiedly bound themselves so that either could successfully require the other to specifically perform.

In the opinion of the court, it is not important that the escrow holder was not to deliver the 50-share lots until after the expiration of the tax year of 1925, in view of the transfer to the vendee of the beneficial interest therein and its obligation to pay, and vendor's right to receive interest from the date of the contract. For the purposes of this suit, the deposit in escrow and delayed deliveries of the 50-share lots are deemed rather matters of form than substance in view of the other provisions just mentioned, and the transaction should be deemed as substantially no different from one passing the title to the 400 shares to the vendee as of the date of the contract with the corresponding obligation upon the vendee to pay for the same in installments as provided, with interest at 6 per cent. upon the deferred payments.

This brings us to the real controversy. All that Mrs. Richardson received during the year 1925 while a resident of Wisconsin was the cash payment for the 101 shares, as to which there is no dispute, and the contract by the vendee to purchase and pay for the 400 shares as provided in the contract. Does the receipt by her of this unconditional agreement by her responsible vendee to take and pay for that stock after 1925 constitute gain or profit to Mrs. Richardson, upon which an income tax for 1925 might be lawfully assessed by the state of Wisconsin? That is the question. Being an isolated transaction on the part of plaintiffs, rather than one of many carried on over a series of years by a mercantile firm selling merchandise on the installment plan, it must be conceded that few of the reasons expressed by the Supreme Court of Wisconsin in State ex rel. Waldheim Co. v. Tax Commission, 187 Wis. 539, 204 N. W. 481, for sustaining an income assessment on the basis of the entire purchase price reserved in conditional sales of merchandise, rather than the cash receipts on such sales, are applicable. See also Motors Acceptance Co. v. Tax Commission, 193 Wis. 41, 214 N. W. 64.

Wisconsin Statutes applicable are as follows:

"Sec. 71.01 There shall be assessed, levied, collected and paid a tax on all income received in each calendar year beginning with the year 1920," etc.

"Sec. 71.02 (2) The term 'income,' as used in this act shall include: * * *

"(d) All profits derived from the transaction of business or from the sale of real estate or other capital assets; provided, that for the purpose of ascertaining the gain or loss resulting from the sale or other disposition of property, real or personal, acquired prior to January 1, 1911, the fair market value of such property as of January 1, 1911, shall be the basis for determining the amount of such gain or loss. * * *

"(3) (a) Persons who customarily estimate their incomes or profits on a basis other than cash receipts and disbursements may, with the consent and approval of the tax commission, return for assessment and taxation the income or profits earned during the income year, in accordance with the method of accounting regularly employed in keeping their books, except as hereinafter provided; but if no such method of accounting has been employed, or if the method used does not clearly reflect the taxable income, the computation shall be made upon such basis and in such manner as in the opinion of the tax commission will clearly reflect such income."

The Wisconsin court has stated that the word "income" is to be given "its ordinary meaning as used in everyday language." Westby v. Bekkedal, 172 Wis. 114, 178 N. W. 451, 453.

In Miller v. Tax Commission, 195 Wis. 219, 217 N. W. 568, 569, it was said:

"It has never been held that the mere exchange of properties constituting capital assets gives rise to a gain upon which an income tax may be imposed. In order to give rise to an income there must be a sale of capital assets at a profit. Generally but not necessarily the sale must be for money. The transaction should be one that constitutes a sale rather than a mere exchange of properties. If the property transferred is compensated by bonds or other securities possessing a fixed market value and which can readily be converted into cash, the transaction probably constitutes a sale. But where a farm, for instance, is exchanged for another farm, the transaction is commonly regarded, not as a sale, but as a mere exchange of properties."

"Income" need not necessarily consist of money, but may consist of that which is convertible into money. In Morgan v. Tax Com-

mission, 195 Wis. 405, 217 N. W. 407, 218 N. W. 810, 61 A. L. R. 357, a distribution to its stockholders by a corporation of stock held by it in other corporations was held not a stock dividend, but taxable as income. In Cliffs Chemical Co. v. Tax Commission, 193 Wis. 295, 214 N. W. 447, distribution of the products of the corporation in kind to its stockholders was held taxable as income. In State ex rel. Howe v. Lee, 172 Wis. 381, 178 N. W. 471, relator received cash and preferred stock of the General Motors Corporation, in return for his stock in the Janesville Machine Company. The lower court held that "the value of the preferred stock could not be assessed as income until it was turned into cash," but this was reversed and a tax on the basis of the stock as well as the cash received was upheld and the value of the General Motors Corporation stock was, in the absence of evidence to the contrary, taken at par. In Zimmers v. Milwaukee, 189 Wis. 269, 206 N. W. 178, payment for corporate stock by a mortgage on corporate property, Liberty bonds, war savings stamps, and certificates of indebtedness belonging to the corporation, was held equivalent of payment of cash and sustained an income tax assessment on the value of the securities received.

The foregoing are, of course, but remotely applicable to the instant question. Lucas v. North Texas Lumber Co., 281 U. S. 11, 50 S. Ct. 184, 74 L. Ed. 668, is more analagous to the case at bar. There the lumber company gave an option to another to purchase its timber lands. December 30, 1916, the option holder gave the lumber company notice that it would close the transaction "as soon as the papers were prepared." The papers were prepared and the transaction closed in January, 1917, but the lumber company returned its profit thereon as a part of its 1916 business, the tax being lower that year than in 1917. The treasury department, however, treated the transaction as of 1917, and this was held correct by the Supreme Court in an opinion in which the following appears:

"An executory contract of sale was created by the option and notice, December 30, 1916. In the notice, the purchaser declared itself ready to close the transaction and pay the purchase price 'as soon as the papers were prepared.' Respondent did not prepare the papers necessary to effect the transfer or make tender of title or possession or demand the purchase price in 1916. The title and right of possession remained in it until the transaction was closed. Consequently uncon-

ditional liability of vendee for the purchase price was not created in that year."

In the instant case the beneficial interest in the stock passed to the vendee in 1925 and its liability to pay therefor and to pay interest then became absolute. It is true that the arrangement between the parties contemplated future payment of money in finally consummating the agreement, and in this the present problem differs from those where stock, bonds, or other obligations are presently accepted in payment for a transfer of property. The question of whether plaintiffs' profit accrued in 1925 is less clear than in most of the cases illustrated by those above referred to. However, the instant the plaintiff received the contract here involved she surrendered the benefits of her stock and possessed the unqualified obligation of a vendee fully able to meet it, which was assignable and undoubtedly convertible into money. Though nonnegotiable and not such a one as is ordinarily dealt in on exchanges, that is not considered essential. I think the contract, in 1925, had a value in plaintiff's hands in excess of the sum she had paid for the stock. In other words, Mrs. Richardson presently realized a gain—a profit—properly cognizable as present income, and in view of the provision for interest and the absence of any evidence or allegation in the pleading to the effect that the contract had a less value than its face, the determination of the tax commission that the transaction permitted assessment of income tax on the sale of the entire 501 shares for the year 1925, and on the basis of the difference between the cost of the stock to Mrs. Richardson and the contract selling price, should be sustained.

A decree will be entered dismissing the suit on its merits, defendants to recover costs to be taxed.