ARMOUR & COMPANY, demandante y apelada, *v.* R. SANCHO BONET, TESORERO DE PUERTO RICO, demandado y apelante.

Núm. 7868.—*Sometido:* Diciembre 21, 1939. *Resuelto:* Octubre 24, 1940.

*Hon. Procurador General George A. Malcolm (Ex-procurador General B. Fernández García y E. Córdova Díaz, Ex-subprocurador General Auxiliar,* en el alegato) y *Jesús A. González, Procurador General Auxiliar,* abogados del apelante; *Rafael Buscaglia,* abogado de la apelada.

El Juez Asociado Señor Hutchison emitió la opinión del tribunal.

El Tesorero de Puerto Rico fué demandado en un pleito de *injunction* para impedir el cobro de ciertas contribuciones de deficiencia que se alegaba habían sido ilegal y arbitrariamente impuestas. Apela de una resolución adversa.

Procediendo en la teoría de que el sistema de contabilidad usado por el contribuyente no "reflejaba claramente su ingreso," el Tesorero basó su actuación en el inciso (b) de la sección 14 de la Ley núm. 74, aprobada el 6 de agosto de 1925 (leyes de ese año, pág. 401). Este inciso lee así:

"(b) El ingreso neto será computado sobre la base del período anual de contabilidad del contribuyente (año económico o año natural, según sea el caso) de acuerdo con el sistema de contabilidad usado regularmente por el contribuyente en sus libros; pero si él no llevare libros de contabilidad, o si el sistema usado no refleja claramente su ingreso, la computación será hecha de acuerdo con el sistema que en opinión del Tesorero refleje claramente el ingreso.

Si el período anual de contabilidad del contribuyente es otro que el de año económico según se define en la sección 3, o si el contribuyente no siguiera un período anual de contabilidad o no llevare libros, el ingreso neto será computado a base del año natural.''

La peticionaria es una corporación del estado de Nueva Jersey, que hace negocios en Puerto Rico y tiene oficinas en Chicago y San Juan. Armour & Co., una corporación de Illinois que tiene su sitio principal de negocios en Chicago, es la corporación matriz y dueña de todas las acciones de la corporación de Nueva Jersey. Existe bastante confusión e incertidumbre no sólo en las declaraciones de los testigos sino también en una estipulación de hechos. Esta última, por ejemplo, contiene la siguiente aseveración:

Según los libros de contabilidad de la casa Armour & Co. en su sucursal de San Juan, Puerto Rico, ''la casa principal de Chicago'' envía mercancías a Puerto Rico, entre otras, jamón, jabón, embutidos, manteca, tocino, etc., y factura dichas mercancías a precio de mercado en San Juan, sobre el cual le abona y paga a la sucursal de San Juan un por ciento que varía desde el 1½ por ciento al 10 por ciento. El precio a que se facturan los productos ''por Chicago a Puerto Rico'' incluye los costos del seguro y el flete hasta la entrega de los productos sobre el muelle en San Juan. Estos gastos son pagados ''por la casa principal en Chicago.'' Los libros de contabilidad de la casa ''Armour & Co.'' en Puerto Rico están llevados correctamente y reflejan todas las operaciones que se efectúan en Puerto Rico. Estos libros no reflejan, en cuanto a los diversos productos que ellos venden en Puerto Rico, el costo original para ''Armour & Co., Illinois'' que opera los establecimientos empacadores que producen estos productos. La sucursal de Puerto Rico vende en la isla al precio que pueda obtener en el mercado de Puerto Rico y estos precios de venta pueden determinarse por sus libros de contabilidad. Las ''cantidades'' que en los años respectivos reclama Armour & Co. como costo de la mercancía que vende en Puerto Rico ''es'' el precio a que la ''casa principal'' factura éstas a su ''sucursal de Puerto Rico'' menos el por ciento que aquélla le concede. El Tesorero de Puerto Rico fijó el ingreso neto tributable en un dos por ciento sobre las ventas totales en Puerto Rico e impuso las contribuciones que se alegan en la demanda y, no conforme, ''Armour & Co.'' recurrió en alzada para ante la Junta de Revisión e Igua-

lamiento, la cual redujo el ingreso neto tributable a un 1½ por ciento sobre las ventas totales en lugar del 2 por ciento fijado por el Tesorero. Estando pendiente de imponerse la contribución por el Tesorero a base de la resolución de la Junta de Revisión e Igualamiento, "Armour & Co." recurrió con estos procedimientos y por orden de esta corte quedó en suspenso la imposición y cobro de dicha contribución.

La peticionaria alegó que era una entidad dedicada al comercio y venta de productos alimenticios. El demandado admitió esto. En su consecuencia si las alegaciones admitidas de la demanda han de ser tomadas como ciertas, la demandante y la corporación matriz se dedicaban al mismo negocio. El significado de este hecho, de ser un hecho, en tanto en cuanto se relaciona con la cuestión de entidades separadas, es obvio.

Fuera de esta sutil aseveración contenida en la estipulación de hechos supra, la evidencia arroja muy poca o ninguna luz sobre el supuesto "contrato" existente entre la demandante y la corporación matriz. El juez de distrito resolvió que "la casa principal de Chicago envía mercancías a Puerto Rico, entre otras, jamón, jabón, embutidos, manteca, tocino, etc., y factura dichas mercancías a precio de mercado en San Juan, sobre el cual le abona y paga a la sucursal de San Juan un por ciento que varía desde el 1½ por ciento al 10 por ciento, de acuerdo con el producto facturado." Esta conclusión, desde luego, sigue el contexto de la estipulación de hechos y es igualmente vaga y poco satisfactoria. Al igual que la estipulación, nos deja a oscuras respecto a si la corporación principal vendía sus productos a la corporación de Nueva Jersey o si traficaba directamente con la sucursal de San Juan de dicha corporación como agente principal y como sucursal de sus propios negocios.

El gerente de la sucursal de San Juan declaró que siempre había utilidades y que sólo ocurrían pérdidas cuando los gastos del negocio excedían de las comisiones. "Si hay beneficios", dijo él, "los mandamos a Chicago." Preguntado si

la casa principal de Chicago trataba a su sucursal de Puerto Rico como si fuera una simple casa comisionista, contestó, "como a un *branch*". Preguntado si " 'Armour & Co. en Chicago', la casa principal, y 'Armour & Co. en San Juan' son la misma entidad", contestó "sí, señor."

La evidencia no demuestra si los directores de las dos corporaciones son los mismos. Asumiendo que la corporación de Nueva Jersey compra a la corporación matriz de Illinois, surge entonces la cuestión de si el contrato existente entre las dos corporaciones puede ser ignorado por resultar injusto para con la subsidiaria. Ésta es en gran parte una cuestión de hecho y, conforme hemos demostrado, los autos están incompletos. La teoría del Tesorero era y es que a virtud de este contrato los libros de la subsidiaria no reflejaban claramente el ingreso neto derivado por la subsidiaria de su negocio en Puerto Rico. Su proceder al acudir al método alternativo para la computación de ese ingreso, tal cual se le autoriza por el inciso (*b*) de la sección 14 de la ley, supra, era presuntivamente correcto, y a la demandante incumbía, a nuestro juicio, demostrar que el contrato era razonable y equitativo y que sus condiciones eran más o menos iguales a las que podían ser fijadas por entidades independientes que negociaran entre sí con toda libertad. La cuestión discutida ampliamente en los alegatos en torno a si el carácter corporativo de la subsidiaria puede ser ignorado, es cuestión que no es menester determinar por ahora. La cuestión en controversia es más bien si el Tesorero podía o no ignorar el contrato existente entre las dos corporaciones, que limitaba las utilidades a ser percibidas por la subsidiaria de sus negocios en Puerto Rico. No hemos hallado caso alguno que resuelva esta cuestión bajo un estatuto idéntico al nuestro.

En *Buick Motor Co.* v. *Milwaukee*, 48 F. (2d) 801, la Corte de Circuito de Apelaciones para el Séptimo Circuito —al discutir una situación similar que surgió bajo disposiciones estatutarias algo similares—dijo:

"Pero se insiste en que debe dársele efecto a la relación contrac-·
tual existente entre las corporaciones, y en que debe resolverse que
los $2,500 de ganancia neta estipulados para el apelante constituye
el ingreso máximo tributable de éste para cada uno de los años en
cuestión. Si el contrato, en lo que a las partes contratantes entre
sí se refiere, es de su faz fraudulento, ello es cuestión que no con-
cierne al Estado en lo que a la imposición de contribuciones sobre
los ingresos obtenidos de los negocios efectuados dentro de sus límites
se relaciona. No importa qué otro fin tal contrato pudiera tener,
parece inevitable la conclusión de que uno de sus objetivos fué trans-
ferir los ingresos que se obtuvieran del negocio en tales estados que
para aquella época tenían, o que más tarde pudieran aprobar, una
ley de contribuciones sobre ingresos, a fin de que los ingresos no
fueran tributables en el estado donde se percibían. Este motivo
por sí solo no justificaría que el estado hiciera caso omiso del
contrato, mas si el apelante, a pesar de la existencia del contrato,
continuaba percibiendo ingresos sobre los negocios efectuados dentro
del estado, el contrato no podría destruir el derecho del estado a
imponer contribuciones sobre los ingresos así devengados.

"La venta del producto era un departamento altamente esencial
en el negocio de la General Motors, ligeramente menos esencial que
la parte fabril del mismo, y esa compañía tenía derecho a que se le
acreditara una parte substancial de las ganancias obtenidas en el
negocio general. Al entregar a la General Motors las remesas de
las ventas efectuadas por el apelante en la sucursal de Wisconsin,
las ganancias que el apelante obtenía en el negocio de Wisconsin pa-
saban a la única dueña de las acciones del apelante—General Motors.
Mientras el apelante efectuaba este inmenso negocio bajo un arreglo
hecho con la General Motors, según el cual los beneficios pasaban
inmediatamente a la General Motors, tales beneficios constituían un
ingreso tributable en Wisconsin antes de que pasaran al único dueño
de las acciones. La distribución de las ganancias corporativas a o
entre los accionistas, en la forma en que se hagan no exime a la
corporación del pago de contribuciones sobre las sumas así obtenidas
y distribuídas. *Cliffs Chemical Co.* v. *Wis. Tax Comm.*, 193 Wis.
295, 214 N. W. 447, 449; *Shaffer* v. *Carter*, 252 U. S. 37, 40 S. Ct.
221, 64 L. Ed. 445; *Houston, etc., Co.* v. *United States* (C.C.A.) 250
F. 1; *Rensselaer & S. R. Co.* v. *Irvin* (C.C.A.) 249 F. 726; *West End
St. Ry. Co.* v. *Malley* (C.C.A.) 246 F. 625; *Judson Freight Forward-
ing* v. *Commonwealth*, 242 Mass. 47, 136 N. E. 375, 27 A.L.R. 1131.''

Véanse también *Palmolive Co.* v. *Conway*, 43 F. (2d) 226, confirmado en 56 F. (2d) 83 (*certiorari* denegado en 287 U. S. 601), *Cliffs Chemical Co.* v. *Wisconsin Tax Commission*, 214 N. W. 447 (*certiorari* denegado en 277 U. S. 574), *People ex rel Studebaker Corporation of America* v. *Gilchrist*, 155 N.E. 68 (Corte de Apelaciones de Nueva York 1926).

En el caso de Studebaker, la Corte de Apelaciones de Nueva York en una luminosa opinión de la mayoría emitida por voz del Juez Cardozo, resolvió que el proceder adop-tado por una comisión de contribuciones no estaba autorizado por el estatuto de Nueva York. El Juez Crane emitió una interesante opinion disidente. El caso no sirve de autori-dad para el criterio de que el proceder adoptado por el Teso-rero de Puerto Rico no estaba autorizado por el inciso (*b*) de la sección 14 de nuestro estatuto, supra.

No debe entenderse que resolvemos que el Tesorero estuvo plenamente justificado al no considerar el contrato existente entre la corporación de Nueva Jersey y su matriz de Illinois como demasiado generoso en favor de esta última o como que transfería a ésta utilidades derivadas por la subsidiaria de su negocio en Puerto Rico, y a decidir que como resultado de tal contrato los libros de la subsidiaria no reflejaban clara-mente su ingreso neto. Tampoco es necesario que resolva-mos ahora que el método alternativo adoptado por el Tesorero claramente reflejaba el ingreso, o que era el único método alternativo disponible, o que era tan razonable y justo que resistiría con éxito la prueba de un pleito sobre devolu-ción de contribuciones pagadas bajo protesta. Bastará decir que la demandante ha dejado de demostrar que el proceder del Tesorero fué arbitrario o sin color de autoridad o que la demandante no tiene un remedio adecuado en el curso ordinario de los procedimientos, o sufriría graves e irre-parables daños a menos que se le concediera el remedio de *injunction*. Véanse *Los Diablos de la Plaza* v. *Sancho Bonet*, 54 D.P.R. 658; *Benítez Rexach* v. *Sancho Bonet*, 54 D.P.R.

751, y *Barceló Marques & Co.* v. *Sancho Bonet,* 55 D.P.R. 284.

 Sin embargo, la apelada insiste en que el demandado había renunciado a la cuestión jurisdiccional y que ésta fué suscitada demasiado tarde al terminar la prueba de la demandante.

En 32 C. J. 365, sección 612, citado por la apelada a este respecto, hallamos lo siguiente (bastardillas nuestras):

"La cuestión de lo adecuado del remedio en derecho debe plantearse mediante excepción previa, *o por lo menos suscitarse especialmente en la contestación,* y no puede plantearse por primera vez durante el juicio."

En 4 Bancroft's Code Practice and Remedies 4488, sección 3442, hallamos el siguiente párrafo:

"*Renuncia de defensa.*—Cuando la parte demandada contesta sobre los méritos y solicita un remedio en equidad, ella no puede más tarde impugnar la jurisdicción de la corte para conceder un *injunction* fundada en que el demandante tiene un remedio adecuado y completo en derecho. Mas cuando en la demanda se alegan los hechos necesarios para conferir jurisdicción y esos hechos son negados en la contestación, la cuestión se convierte en una de hecho y no es renunciada al contestarse sobre los méritos, y si la falta de jurisdicción aparece durante el juicio, el pleito debe ser desestimado."

La contestación del demandado al negar y al contener alegaciones afirmativas y defensas especiales elaboradas, cumplió plenamente con estos requisitos.

*La orden concediendo el* injunction *pendente lite y la sentencia final apeladas deben ser revocadas y la demanda declarada sin lugar.*