Félix Benítez Rexach, demandante y apelado, *v.* R. Sancho Bonet, Tesorero de Puerto Rico, demandado y apelante.

Núm. 7558.—*Sometido:* Mayo 12, 1938. *Resuelto:* Mayo 11, 1939.

*Hon. Procurador General B. Fernández García* y *E. Campos del Toro, Procurador General Auxiliar,* abogados del apelante; *Miguel Guerra-Mondragón,* abogado del apelado.

El Juez Presidente Señor Del Toro emitió la opinión del tribunal.

Félix Benítez Rexach entabló un pleito de *injunction* contra el Tesorero de Puerto Rico Rafael Sancho Bonet, basándose sustancialmente en los siguientes hechos:

Que era en todas las fechas que se mencionan en la demanda y al interponerla dueño de un "establecimiento o balneario conocido por el nombre de Escambrón Beach Club, situado en la Reserva Militar Federal del Escambrón, en la ciudad de San Juan", sobre la cual "ejerce jurisdicción exclusiva para todo propósito" el Gobierno de los Estados Unidos;

Que el demandado so color de una autoridad que no tiene ha tasado la propiedad mueble e inmueble que el demandante posee en dicha Reserva y le ha impuesto contribuciones montantes a $5,291.97 que intenta cobrar sumaria-

mente en defecto de pago, a cuyo efecto en junio 25, 1936, le embargó dos edificios, dos casetas de baño, una casa, tres paseos, un puente, una planta de hielo y una caseta para orquesta situados en la repetida Reserva y que forman parte integral del dicho Escambrón Beach Club;

Que la tasación, imposición de contribuciones y embargo indicados son ilegales, habiéndose excedido el Tesorero demandado de modo arbitrario en sus facultades como tal; que de llevarse a cabo el cobro, el demandante sufriría daños irreparables consistentes en verse sujeto a pleitos innecesarios para recobrar dichas contribuciones que tendría que pagar bajo protesta, y que carece de todo otro recurso rápido, adecuado y eficaz.

Mientras se decidía el pleito en definitiva, solicitó la expedición de un *injunction* preliminar. Ordenó la corte al demandado que compareciera a mostrar causa, si la tuviere, por la cual no debiera concederse el remedio solicitado y lo puso en entredicho mediante fianza de quinientos dólares, y el demandado contestando la orden de entredicho y la solicitud de *injunction* preliminar, el 3 de septiembre de 1936 pidió a la corte que disolviera la primera y declarara sin lugar el segundo porque el derecho en que se fundaba la demanda no era claro y envolvía una controversia de títulos, porque tendía a impedir el cobro de una contribución, porque los daños no eran irreparables ni se daría lugar a una multiplicidad de procedimientos, porque el demandante no comparecía con manos limpias y porque tenía un remedio adecuado en ley.

Como defensa afirmativa y de oposición a los hechos alegados sostuvo que el Pueblo de Puerto Rico era el dueño de los terrenos donde está el Escambrón Beach Club a virtud de convenio celebrado entre El Pueblo de los Estados Unidos de América y El Pueblo de Puerto Rico, mediante el cual el primero traspasó al segundo, a cambio de otra propiedad, los terrenos en cuestión que estaban en posesión en la actualidad de El Pueblo de Puerto Rico, estando únicamente pen-

dientes de formalización los documentos correspondientes a la transferencia del título; que el demandante entró y está disfrutando de la posesión de dichos terrenos a virtud de contrato de arrendamiento celebrado en diciembre 18, 1931, con El Pueblo de Puerto Rico, estando en su consecuencia impedido de negar los términos de dicho contrato y el título de su arrendador, y que a virtud de lo alegado resultaba que la contribución fué impuesta y el embargo trabado de acuerdo con la ley.

Siete días después comparecieron las partes ante la corte, presentando el demandante la evidencia que sigue:

Contrato de arrendamiento celebrado el 15 de diciembre de 1931 entre El Pueblo de Puerto Rico representado por Guillermo Esteves, Comisionado del Interior, y Félix Benítez Rexach, ingeniero, vecino de San Juan. Dice, copiado a la letra, en lo pertinente, lo que sigue:

"Contrato de arrendamiento de un predio de terreno, propiedad del Pueblo de Puerto Rico con sujeción a las siguientes cláusulas y condiciones.

"1. . . . radicado en los alrededores del sitio denominado Escambrón siendo parte de los terrenos del Gobierno Insular destinados a la construcción del Parque Muñoz Rivera, de una superficie de: diez mil setecientos (10,700) metros cuadrados según aparece descrito topográficamente en el plano que se une . . .

"2. . . . se destinará y se usará como sitio de recreo y playa en conexión con un Balneario a construirse, y se edificarán en dicho predio todas las obras y edificios necesarios . . .

"3. El canon de arrendamiento será de mil doscientos ($1,200) dólares anuales . . .

"4. El término del arrendamiento será de quince (15) años y empezará a contarse un año después de la fecha de firmarse este contrato, comprometiéndose el arrendatario Don Félix Benítez Rexach, a invertir en las obras una cantidad no menor de treinta mil (30,000) dólares, y siendo además convenido entre las partes, en que por cada dos mil (2,000) dólares que sobre la cantidad estipulada de dichos treinta mil (30,000) dólares, invirtiere el Sr. Benítez Rexach, tendrá derecho a un año más de arrendamiento, pero con el

entendido de que el término del arrendamiento (no) será mayor de TREINTA (30) AÑOS, sea cualquiera la cantidad adicional invertida.

"6. Al vencimiento de este contrato quedarán a beneficio del Parque Muñoz Rivera todas las obras construídas y medios auxiliares de explotación, a excepción de todas las obras de carácter permanente que pasarán a la propiedad del Gobierno mediante su pago al arrendatario y previa tasación pericial nombrada por ambas partes.

"15. Este contrato está sujeto a la eventualidad de que se ultime por el Gobierno de los Estados Unidos el traspaso de los terrenos de la Reserva del Escambrón a favor de El Pueblo de Puerto Rico."

Testigo Lucas Jiménez, Colector de Rentas Internas de San Juan. Se le mostró la notificación de embargo y reconoció que estaba firmada por él, admitiéndose el documento sin objeción. Se describen los bienes embargados, así:

"Finca urbana, situada en Puerta de Tierra, Escambrón, del municipio de P. R., con cabida de Solar del Gobierno Federal, conteniendo las siguientes edificaciones, 2 edificios, 2 casetas de baño, una casa, 3 paseos, un puente, una planta de hielo, una caseta para orquesta, todo nuevo. Norte_____, Sur_____, Este Gobierno Federal, Oeste_____."

A preguntas del demandado contestó que no se había embargado solar alguno del Gobierno Federal.

Memorándum del Subtesorero al Tesorero de Puerto Rico de noviembre 12, 1935; carta del demandado al demandante de noviembre 21, 1935, y *Bill* Núm. 2394 presentado a la Cámara de Representantes de los Estados Unidos en abril 11, 1935, titulado, "Ley para autorizar la cesión de ciertas reservas militares a otros departamentos del Gobierno, y para otros fines", en cuya página 3, líneas 12 a 13 se lee: "A El Pueblo de Puerto Rico: cierta parcela de terreno dentro de la Principal Reserva Militar, San Juan, Puerto Rico, que contiene 46 acres, más o menos, conocida por el nombre de 'Escambrón Tract' ", que se admitieron sin objeción.

Del memorándum se transcribe lo que sigue:

"Las contribuciones que adeuda el señor F. Benítez Rexach, según los apartados marcados 1 y 2 en la carta de fecha 6 de noviembre del señor Rexach, que se acompaña, corresponden a:

"1. Contribuciones sobre la propiedad inmueble en el Escambrón Beach Club, desde el año 1933–1934 al 1935–36, ambos inclusive, y ascienden, con recargos e intereses, a $4,962.98. También adeuda por contribuciones sobre la propiedad mueble, por los mismos años, la cantidad de $328.99 o sea un total de contribuciones sobre la propiedad ascendente a $5,291.97.

"2. Contribuciones por compensaciones a obreros, desde el año 1926–27 al 1932–33, ambos inclusive, ascendentes a $1,773.34.

"3. Contribuciones por concepto de arbitrios, ascendentes aproximadamente a $2,355.95.

"Respecto a las primeras, o sea, contribuciones sobre la propiedad inmueble o mueble, el señor Benítez Rexach tiene la creencia de que el Tesorero carece de autoridad para imponer contribuciones sobre las edificaciones, mobiliario y enseres del Escambrón Beach Club, porque dichas edificaciones, etc., están ubicadas sobre propiedad del Gobierno Federal.

"Basa su creencia el señor Benítez Rexach en que, de acuerdo con el artículo 291 del Código Político, la propiedad de los Estados Unidos y toda propiedad exenta del pago de contribuciones por las leyes de los Estados Unidos, estarán exentas de tributación para la imposición de contribuciones y, esto es un error, porque los edificios, mobiliario y enseres enclavados sobre tierra propiedad de los Estados Unidos, no pertenecen a los Estados Unidos y sí al señor Félix Benítez Rexach.

En la carta del demandado al demandante, se le dice:

"Ahora bien, en cuanto a solicitar la opinión del Procurador General con respecto a este asunto, a virtud de que el titular del Departamento de Hacienda es perito en derecho, parece pertinente que dicha opinión no se solicite, pues el que suscribe no tiene duda alguna, a virtud de los hechos envueltos y de la jurisprudencia sentada en cuanto a las contribuciones de arbitrios y, por razón de no pertenecer la propiedad ubicada en el Escambrón Beach Club al Gobierno Federal, de que las contribuciones fueron debidamente impuestas y por consiguiente se adeudan por Ud.

"Esto no obstante, si Ud. tuviera alguna copia de documentación que justifique que la mencionada propiedad mueble e inmueble ubi-

cada sobre los terrenos del Escambrón pertenecen o habrán de pertenecer en alguna ocasión al Gobierno Federal, tendré mucho gusto en revisar tal documentación, pues no cabe duda alguna que, de acuerdo con las disposiciones del artículo 291 de nuestro Código Político la propiedad de los Estados Unidos, y toda propiedad exenta del pago de contribución por las leyes de los Estados Unidos, estarán igualmente exentas de tributación para la imposición de contribuciones por El Pueblo de Puerto Rico, pero no así aquella que, estando enclavada en terrenos de los Estados Unidos, no perteneciere al Gobierno Federal.

"Mientras tanto, ruégole se sirva prestar su mejor atención al pago de las contribuciones de referencia, pudiendo pagarlas bajo protesta si Ud. lo desea, o en la forma y manera que, siendo menos lesiva a sus intereses, permita un arreglo de esta cuestión sin nuevas dilaciones, ya que el suscribiente está en buena disposición para conceder a Ud. las facilidades que sean pertinentes."

A la admisión de cierta carta de Lewis M. Milbourne, Colector Interino de Rentas Internas de Baltimore, Md., se opuso el demandado por considerarla inmaterial y por no estar relacionada con la controversia. Fué admitida. Tiene fecha julio 15, 1935; está dirigida al Escambrón Beach Club, San Juan, Puerto Rico, y dice:

"The Commissioner of Internal Revenue, Washington, D. C. has directed this office to secure from your club the following detailed information necessary to determine whether or not it would be subject to the Federal income tax.

"1. Complete explanation of the form of organization of the club; i. e., whether it is owned and operated by an individual, by a corporation or otherwise.

"(a) If the club is operated by a corporation, state the date of incorporation, where formed or organized and under what laws. A copy of the articles of incorporation and the by-laws or other form of rules and regulations governing the activities of such corporation should be given.

"2. Whether income is derived from sources within the United States (exclusive of the income derived from the patronage of the club which is located within the grounds of the Escambrón Military Reservation). Explain in detail.

"(a) Amount of income from such sources.

"You should also furnish copies of the club's financial statements showing assets and liabilities as at the close of each of the years 1934, 1933, 1932 and 1931 and all receipts and disbursements during the same periods."

Testigo José Maduro, encargado de los contratos de arrendamiento en la Auditoría Insular. Reconoció dos cartas que fueron admitidas en evidencia. La primera, fechada en marzo 10, 1932, la dirige Benítez Rexach a Esteves. Dice:

"En vista de las dificultades surgidas recientemente entre las autoridades militares y el Gobierno Insular lo cual ha traído consigo la dilación de las obras en el Escambrón para el balneario, me permito traer a su atención lo siguiente:

"Cuando ultimamos los términos del contrato, según usted recordará, fué pactado de mutuo acuerdo que el término del arrendamiento empezaría a contar un año después de la fecha de firmarse el contrato para de este modo no pagar arrendamiento alguno durante el tiempo que durase la construcción y empezar a pagar cuando el negocio empezase a producir algo, y calculamos que se necesitaría un año aproximadamente para realizar las obras.

"Resulta ahora, que han pasado ya tres meses y todavía el Congreso no ha aprobado la transferencia, siendo también muy posible que transcurran muchos meses más sin que pueda yo empezar las obras.

"No deseo emplear mucho tiempo en explicarle más detalladamente este punto, pues estoy seguro que usted se dará cuenta exacta de la situación.

"Le suplico que dejemos eso aclarado y le sugiero me escriba una carta en el sentido de que en vista de la situación que se ha presentado, el contrato empezará a contar un año después de la fecha en que el Gobierno Federal le dé posesión oficial al Gobierno Insular de dichos terrenos, por tanto pagando arrendamiento un año después de haberlos yo recibido."

Y la segunda, de marzo 17, 1932, es de Esteves a Rexach. Lee:

"Se accede a lo solicitado de acuerdo con la cláusula 15' que en nota adicional aclaratoria aparece en el contrato de arrendamiento; es decir, que la fecha en que empezará a regir su contrato, será en la misma fecha en que se traspasen esos terrenos a El Pueblo de Puerto Rico y usted pueda disponer libremente de los terrenos arren-

dados, en vez de contarse desde la fecha en que fué firmado el contrato como se dice en la cláusula 4.''

Reconocidas también por el testigo Maduro se admitieron una carta de marzo 28, 1932, dirigida por el Subauditor de Puerto Rico al Tesorero autorizando la cancelación de borderós por $46.40 y $600 expedidos a nombre del demandado, y otra de febrero 23, 1933, del Comisionado del Interior al Tesorero en relación con los dichos borderós y con las cartas de Benítez Rexach y de Esteves de las cuales se transcribió lo pertinente.

Testigo Armando Morales, Jefe Auxiliar de la División de Terrenos Públicos del Departamento del Interior. Reconoció el plano que se introdujo en evidencia levantado en 1909, que sirvió de base a la proclama del Presidente sobre reservas militares, comprendiendo los terrenos del Escambrón. También reconoció la Proclama—Orden General Núm. 97 de julio 7, 1903—que incluye los terrenos del Escambrón y que se admitió en evidencia. Y con ello terminó la prueba del demandante.

El primer testigo del demandado fué Guillermo Esteves, Comisionado del Interior de Puerto Rico desde 1918 a 1932. Dijo:

"Alrededor del año '25, el Gobierno de Puerto Rico interesaba realizar ciertas permutas de terrenos insulares por terrenos federales. Incluían estos terrenos numerosas parcelas de terreno de la propiedad federal que habían sido reservadas por el Gobierno de los Estados Unidos que el Gobierno de Puerto Rico interesaba conseguir. Alrededor de ese año la Legislatura de Puerto Rico pasó una ley autorizando al Gobierno de Puerto Rico a realizar una serie de permutas de terrenos y propiedades insulares por terrenos y propiedades federales. En general, la idea era que el Gobierno Federal entregara al Gobierno de Puerto Rico todas las tierras federales que se hallaran al Este de una línea que cruzara el Capitolio en dirección Norte-Sur; a cambio de eso El Pueblo de Puerto Rico daba otras propiedades. Entre estos terrenos que se encuentran al Este de esta línea Norte-Sur estaba la parcela del Escambrón, que se extiende al Este de la línea Norte-Sur pasando por el Capitolio. Estas gestiones se llevaban

a cabo a virtud de correspondencia entre el Gobernador de Puerto Rico, la Secretaría de la Guerra, que era entonces el Departamento al cual estaba adscrito Puerto Rico, y los otros departamentos que tenían autoridad sobre esas parcelas, puesto que algunas estaban bajo el Departamento de Comercio, otras bajo el Departamento de Marina, y otras bajo el Departamento de la Guerra. Para esa época el Gobierno Insular había ya empezado a construir el Parque Muñoz Rivera y el límite de la parcela insular que queda frente a la Colectiva, que es hoy Parque Muñoz Rivera, se extendía solamente hasta una línea que más o menos ocupa hoy la extensión de la carretera de la Avenida Muñoz Rivera, en el Sur. Una de las parcelas, por tanto, que el Gobierno de Puerto Rico interesó más inmediatamente dentro de la permuta general que estaba gestionando, fué, por tanto, la parcela denominada 'El Escambrón.' El Departamento de la Guerra al discutir la permuta de esta parcela aparte de la permuta general de terrenos, exigió a El Pueblo de Puerto Rico que se le facilitara un tiro al blanco, puesto que es de conocimiento de todos que existía en el Escambrón el tiro al blanco del Regimiento. Por una Ley de la Legislatura se apropió dinero, fondos, para la adquisición de tierras, y entonces El Pueblo de Puerto Rico, con la aprobación del Departamento de la Guerra, adquirió una parcela de terreno, que hoy se llama 'El Campamento Buchanan', a donde le instaló el tiro al blanco que tenía el Gobierno Federal en la parcela del Escambrón.

"Una vez que se le dió posesión por medio de una escritura al Gobierno Federal de la parcela del 'Campamento Buchanan'—escritura que aceptó el Gobierno de los Estados Unidos—el Gobierno de Puerto Rico procedió a ocupar la parcela del Escambrón, bajo autoridad concedida por el Departamento de la Guerra. . . ."

Pedida por el demandante la eliminación de todo lo declarado, continuó el interrogatorio como sigue:

"A.—Dígame, señor Esteves, ¿usted, en su carácter de Comisionado del Interior, en aquella fecha tomó usted posesión de los terrenos denominados 'El Escambrón'?

"T.—Absolutamente. Tomé posesión y ejecutamos obras en ellos.

"A.—Usted acaba de declarar que tomó posesión El Pueblo de Puerto Rico y que ejecutaron obras allí. ¿Qué obras ejecutaron allí?

"T.—Las del Parque Muñoz Rivera, el parque de pelota, la carretera que da la vuelta por el mar. . . .

"A.—Ahora dígame, ¿y la construcción de esas obras ocupó algún tiempo?

"T.—Ya lo creo. Están todavía en construcción en este momento. Varios años.

"A.—¿Y durante ese período de tiempo usted tuvo conocimiento de que el Gobierno de los Estados Unidos objetara la construcción de esas obras y ordenara la paralización de las mismas?

"T.—Hasta el año 1932 que yo estuve de Comisionado nunca tuve noticias de nada de eso.

"A.—¿Y usted sabe si el Gobierno de los Estados Unidos tuvo conocimiento de que El Pueblo de P. R. había ocupado esos terrenos y que estaba fabricando esas obras?

"T.—Tiene que haber tenido conocimiento puesto que hay correspondencia, que debe existir en el Departamento del Interior, donde no se hace objeción a esas obras.

"Dte.—Para solicitar la eliminación.

"Juez.—Sí, que se elimine lo que dice la correspondencia esa.

"Demandado.—A.—Mostrándole al testigo un documento. Es una copia de un cable.

"T.—Un cable de Creed F. Cox, Assistant del Jefe del Bureau de Asuntos Insulares del Departamento de la Guerra, al Gobernador de Puerto Rico."

Se admitió finalmente sin objeción el cable. Dice:

"Escambrón Tract comma agreement between War Department and Insular Government in nineteen twenty five and nineteen twenty six contemplated exchange of above tract for new target range without reservation of bathing beach stop Insular Government has carried out agreement at large expense and deeded Camp Buchanan to the United States stop Immediate transfer of Escambrón prevented by a change of the law necessitating reference to Congress stop While the War Department did not realize Insular Government would at once start construction comma it would not be justified in stopping construction now as embarrassment and loss to Insular Government and contractor would result stop Notify the Insular Government that objection to present construction work is withdrawn stop In order to prevent further complicating the matter during its consideration by Congress comma no further construction should be started on the site stop In view of fact that War Department is morally committed to the transfer and as Insular War Department should now show

its good faith and permit the Porto Rican Government free use of the Escambrón Tract stop This would require discontinuing bathing by military personnel and fireing by antiaircraft organizations stop.''

Continúa declarando el testigo como sigue:

''Demandado: A.—Testigo, aquí se ha presentado como evidencia un contrato de arrendamiento otorgado por el Comisionado del Interior con Félix Benítez Rexach en diciembre 18 de 1931. ¿Ese contrato fué otorgado por usted en su capacidad oficial?

''T.—''Sí, señor.

''A.—¿Los términos de ese contrato fueron discutidos por usted y el señor Benítez Rexach?

''T.—Sí, señor.

''A.—Y dígame, testigo, a virtud de ese contrato . . . ¿quién le entregó posesión al señor Benítez Rexach de los terrenos que él actualmente ocupa?

''T.—El Departamento del Interior.

''A.—¿Se le entregó a virtud de ese contrato?

''T.—Sí, señor, a virtud de ese contrato.

''A.—¿Y él entró en posesión de ese terreno a virtud de este contrato?

''T.—A virtud de este contrato.

''A.—Durante el tiempo en que el señor Benítez ha estado ocupando los terrenos del Escambrón ¿él inició la construcción de obras allí?

''T.—Inmediatamente que firmó el contrato inició la construcción de obras.

''A.—¿Y para la aprobación de esas obras el señor Benítez Rexach tuvo que dirigirse a alguna persona?

''T.—Él sometió los planos al Departamento del Interior.

''A.—¿Y ustedes se los aprobaron?

''T.—Sí, señor.

''A.—Y dígame, ¿usted sabe si durante el tiempo en que el señor Benítez Rexach ha estado ocupando, en su carácter de arrendatario, esos terrenos, él ha sido perturbado en la posesión de dichos terrenos?

''T.—Hasta 1932, que yo tengo conocimiento oficial, nunca fué perturbado.

''A.—¿Y el Gobierno Federal? ¿Usted sabe si el Gobierno Federal en alguna ocasión le prohibió a él la construcción?

''T.—A mí no me consta.

''A.—Me refiero hasta la fecha en que usted fué Comisionado.

''T.—Nunca tuve conocimiento de que fuera obstaculizado.''

Reconoce el memorándum que dirigiera como Comisionado del Interior al Gobernador de la Isla, que se admite en evidencia. Dice:

"For some time past, the Governor of Porto Rico had been trying to find some possible way whereby the problem of constructing several important public works, such as a new insane asylum, a modern penitentiary, a new public park, and a public road to serve as a new traffic outlet to San Juan, might be solved.

"Many have been the efforts made to carry out this building program, and as the Insular Government did not possess the necessary sites for the purpose in view, an official correspondence was started with the Federal Authorities in order to secure certain lands owned by the Federal Government which were used as Military and Naval reservation, in exchange for various public buildings belonging to the People of Puerto Rico, which on account of their proximity to the Military Post of San Juan, were desired by the Military authorities.

"Seeing that both governments, the Federal and the Insular, were mutually interested in the exchange of these properties to meet their various needs, General McIntyre, Chief of the Bureau of Insular Affairs recommended in one of his letters, that a study should be made whereby the transfer of these properties might be accomplished. He recommended particularly, that as regards the construction of 'Muñoz Rivera Park' in Puerta de Tierra, the Insular Government should try to acquire near San Juan a suitable target range and aviation field, and to transfer same to the Federal Government in exchange for the lands known as the 'Escambrón', which might serve to increase the area of said park, extending its north side to the shores of the Atlantic Ocean.

"With these recommendations in mind, representatives of both governments, after several conferences, reached a satisfactory agreement, and a law was passed by the Legislature of Porto Rico, approved by the Governor on June 17, 1925, whereby the Governor of Porto Rico was authorized to purchase and equip a suitable target range and aviation field and to convey the same, with other properties, to the United States, and to accept from the United States certain properties that are no longer needed for the purpose by the United States; to authorize the issue of bonds of the People of Porto Rico in the sum of two hundred thousand (200,000) dollars to carry out such purchase, and for other purposes.

"The bonds authorized by this Law were issued and sold; the target range and aviation field were constructed and transferred to the Military Authorities at San Juan, P. R. who are at the present 'time in possession of them.

"As by section 2 of the above mentioned Law, the Governor of P. R. is authorized to accept, in the name of the People of Porto Rico several properties of the United States, among others, the parcel of land known as 'El Escambrón', which is to be added to the "Muñoz Rivera Park', now under construction and it being necessary that the Insular Government be given now possession of this land, I respectfully request of you to take up the necessary steps with the Federal Government so that the required transfer might be made."

Repreguntado por el demandante, contestó:

"Demandante: A.—Señor Esteves (mostrándole el contrato de arrendamiento entre el señor Esteves y el señor Benítez Rexach), ¿esta cláusula 15 a fué añadida cuántos días después del contrato?

"T.—El contrato principal fué celebrado el 15 de diciembre de 1931 y la cláusula núm. 15 a fué añadida en diciembre 18 de 1931.

"A.—¿Qué motivó esa cláusula 15 a?

"T.—Esta cláusula la motivó el pensar que el Gobierno de Puerto Rico, como todavía el Gobierno Federal no había pasado ninguna Proclama ni se había aprobado ninguna ley entregándole la reserva del Escambrón a El Pueblo de Puerto Rico, se quiso dejar a salvo cualquier reclamación que pudiese el señor Benítez Rexach establecer más tarde en virtud de ejecutar obras ahí. Ese es el fin de la cláusula. La puse para proteger a El Pueblo de Puerto Rico.

"A.—Pero se contradice, sin embargo, con la cláusula anterior, en que se dice que El Pueblo de Puerto Rico es el dueño, ¿verdad?

"T.— . . . . . . .

"A.—Esa fué la primera modificación del contrato. Y la segunda, ¿cuál fué? ¿La recuerda?

"T.—La segunda modificación del contrato fué por carta; no había modificación del propio contrato, sino que el señor Benítez Rexach no recuerdo cuándo me envió una carta aclarando cuándo debía principiar a contar su contrato; una carta de marzo 10 de 1931.

"A.—Usted la contestó, ¿verdad?

"T.—Sí, señor.

"A.—En esa carta ¿no le especificaba usted al señor Benítez Rexach que era el Congreso la única autoridad que podía darle título?

"T.—En la carta se dice que ya que el Congreso de los Estados Unidos no ha aprobado legislación para aprobar el traspaso de ese

terreno, se accede a lo solicitado, o sea que el contrato empezaría a regir en la fecha en que se traspasasen estos terrenos a El Pueblo de Puerto Rico.

"A.—Es decir, ¿que desde esa fecha El Pueblo de Puerto Rico ha eximido al señor Benítez Rexach de pagar el canon de arrendamiento?

"T.— . . . . . . .

"Juez.—Sí, si hasta el Auditor dejó de cobrarle.

"Dte.—Nada más."

Compareció otra vez Armando Morales, ahora como testigo del demandado, y preguntado al efecto, contestó:

¿Qué intervención tuvo el Gobierno Federal, si alguna tuvo, y a usted le consta, en relación con las obras llevadas a efecto por Félix Benítez Rexach en la parcela de El Escambrón de que se trata en este caso?

"T.—De acuerdo con la documentación que existe ahí en el expediente de arrendamiento del señor Benítez Rexach, nosotros tenemos una petición de él al Gobierno Federal pidiendo autorización para establecer unos pilotes y una red de alambre para evitar la entrada de peces a la ensenada que forma allí la playa del Escambrón en este sitio y para la construcción de una plataforma de concreto. De acuerdo con el Acta Orgánica, el Gobierno Federal tiene jurisdicción sobre las obras que se ejecuten en zona de aguas navegables. . . .

"A.—¿Y ésa fué toda la intervención que tuvo el Gobierno Federal en este asunto?

"T.—Sí, señor.

"A.—¿Y en cuanto a la tierra. . . . ?

"T.—No, en cuanto a los terrenos no tuvo ninguna intervención; los terrenos pertenecen a El Pueblo de Puerto Rico.

"A.—Y en cuanto a las obras no hubo. . . .

"A.—Nada, nada. Como las tierras sumergidas pertenecen a El Pueblo de Puerto Rico, ellos también notifican a El Pueblo de Puerto Rico para si tiene que hacer alguna objeción. . . ."

Por último llamó el demandado a declarar al abogado del demandante Sr. Guerra Mondragón. Dijo:

"A.—Dígame, señor Guerra, ¿usted es apoderado del señor Benítez Rexach?

"T.—Para este asunto y otro más.

"A.—¿Usted, como tal apoderado, conoce todas las operaciones y todos los negocios del señor Benítez Rexach relacionados con El Escambrón?

"T.—Casi todos.

"A.—Dígame, ¿usted sabe con motivo de ese conocimiento que usted tiene de los negocios del señor Benítez Rexach ahí en el Escambrón, usted sabe si el señor Benítez Rexach recientemente ha subarrendado El Escambrón?

"T.—Sí, como no. Desde el mes de junio o julio; a fines de junio.

"A.—¿Y a virtud de ese contrato de subarrendamiento el señor Benítez Rexach ha de recibir alguna compensación o remuneración?

"T.—Él personalmente no. Le ha cedido el canon. . .

"A.—¿Cómo es?

"T.—Que él personalmente no; le ha cedido el canon a su señora esposa.

"A.—¿Lo recibe él y él se lo ha cedido a la esposa?

"T.—Lo recibe ella personalmente.

"A.—¿Pero en principio pertenece a él directamente?

"T.—A los dos; son bienes gananciales.

    \*        \*        \*        \*        \*        \*        \*

"¿Usted sabe por qué autoridad está el señor Benítez Rexach ocupando eso?

"T.—Por la autoridad del contrato. Y está expuesto a que un Congreso que no entienda de estas cosas, de estos asuntos, no le dé la gana de pasar la Ley y el señor Benítez Rexach quedaría en el aire.

"A.—¿Pero hasta la fecha el Congreso no ha intervenido con el señor Benítez Rexach?

"T.—En absoluto.

"A.—Y los beneficios de ese negocio, ¿Quién los percibe? ¿Benítez Rexach?

"T.—Ahora ella.

"A.—¿A cuánto ascienden esos cánones de arrendamiento?

"T.—24,000 pesos anuales. Y puedo decirle que por anualidades adelantadas también."

Tal, en resumen, la evidencia practicada en 10 de septiembre, 1936. El primero de octubre siguiente archivó el demandado su contestación formulada en el mismo sentido que la que dió a la orden de entredicho.

Ambas partes presentaron entonces la siguiente estipulación:

"Que todas las cuestiones de derecho que tenían y tienen que suscitar en el caso de autos fueron planteadas ya el día de la vista para mostrar causas el demandado por las cuales no debiera decretarse el *injunction* preliminar solicitado por la parte actora, y que fueron discutidas además en los respectivos alegatos presentados. Manifiestan las partes que todas las cuestiones de hecho que tenían y tienen que suscitar fueron asimismo levantadas el día mencionado y que no teniendo más prueba que presentar que la ya aducida, estipulan y convienen, previa la aprobación de la Corte, que la decisión que dicte este Hon. Tribunal en el mencionado incidente de *injunction* preliminar, sea hecha extensiva, como decisión final al auto de *injunction* perpetuo.

"Aceptan asimismo las partes la existencia del convenio entre el Gobierno de Wáshington y el de Puerto Rico, tal como se desprende de la declaración del testigo Guillermo Esteves y del Exhibit A del demandado, obrante en estos autos. Y por último, las partes aceptan, además, que se han hecho gestiones y se están haciendo gestiones por el Departamento del Interior de Puerto Rico cerca del Congreso y de las autoridades de Wáshington para perfeccionar el título de los terrenos del Escambrón."

La estipulación fué en efecto aprobada por la corte que resolvió el caso por sentencia de 19 de octubre, 1936, declarando la demanda con lugar. Y es contra dicha sentencia que se ha interpuesto el presente recurso de apelación por la parte demandada, basándose en el siguiente señalamiento de errores:

"1. La Corte de Distrito de San Juan cometió error al resolver y declarar que El Escambrón Beach Club está ubicado en terrenos sobre los cuales los Estados Unidos de América ostenta título dominical y ejerce jurisdicción exclusiva.

"2. . . . al resolver y declarar que el Gobierno de Puerto Rico no tiene autoridad ni puede ejercer jurisdicción para imponer contribuciones a los edificios del demandante enclavados en los terrenos conocidos por El Escambrón dentro del territorio de Puerto Rico.

"3. . . al resolver y declarar que el derecho en que funda su petición el demandante es claro y no envuelve una controversia de título que no puede ser dirimido en este procedimiento sumario,

siendo tal cuestión una para ser discutida y resuelta en un pleito plenario.

"4. . . . al resolver que el remedio solicitado por el demandante no viola las disposiciones de la ley que prohibe la expedición de autos de *injunction* tendientes a impedir el cobro de contribuciones.

"5. . . . al resolver que el demandante bajo los hechos alegados en la demanda no venía obligado a pagar la contribución bajo protesta, remedio adecuado y eficaz que la ley le concede para la protección de sus derechos.

"6. . . . al resolver y declarar que la demanda aduce hechos suficientes para conceder al demandante el remedio de *injunction* solicitado.

"7. . . . al resolver y declarar que no es aplicable a este caso la doctrina de 'estoppel' y que el demandante no había actuado con manos limpias."

Tras un estudio detenido de todas las cuestiones envueltas, opinamos que la sentencia apelada debe revocarse.

■■ Los hechos surgen claros de las alegaciones y la evidencia y hablan tan fuertemente a la conciencia del juzgador que éste puede y debe actuar sin vacilación alguna al pronunciar su fallo.

De modo terminante el legislador ha prescrito:

"No podrá otorgarse un *injunction:*

＊　　＊　　＊　　＊　　＊　　＊　　＊

"7. Para impedir la imposición o cobro de cualquier contribución establecida por las leyes de los Estados Unidos o de Puerto Rico." Art. 678 del Código de Enjuiciamiento Civil, ed. 1933.

Y aquí se trata del cobro de la contribución general que sobre toda propiedad impone la ley en Puerto Rico.

Es cierto que no obstante lo terminante del precepto legal citado, las cortes han continuado expidiendo el auto equitativo de *injunction* en casos extraordinarios. *Miller* v. *Nut Margarine Co.,* 284 U. S. 498; *Durlach Bros., Inc.* v. *Domenech, Tes.,* 47 D.P.R. 654. ¿Puede éste considerarse uno de ellos? En manera alguna a nuestro juicio.

En primer lugar si el peticionario creía que no debía pagar la contribución que se le cobraba, debió cumplir con la obligación que le impone y ejercitar el derecho que le

concede la Ley Núm. 8 de 1927, Leyes de ese año, pág. 123, como sigue:

"Sección 1.—Cuando algún contribuyente creyere que no debe pagar cualquier contribución o parte de ella, estará no obstante obligado a pagarla en su totalidad, a requerimiento del colector de rentas internas de su distrito, o del funcionario encargado de la recaudación, y si desea establecer alguna reclamación, al efectuar el pago, pedirá a dicho colector, o funcionario recaudador, que consigne su protesta al dorso del recibo indicando específicamente si ésta se refiere al todo o parte de la contribución que ha sido pagada bajo protesta, y precisando el montante de lo impugnado. Dicha nota será firmada por el contribuyente y por el colector o funcionario encargado de la recaudación."

"Sección 3.—El contribuyente que haya pagado el todo o parte de cualquier contribución bajo protesta, podrá, dentro del plazo de un año, a partir de la fecha del pago, demandar al Tesorero de Puerto Rico en una corte insular de jurisdicción competente, o en la corte de distrito de los Estados Unidos para Puerto Rico, para obtener la devolución de la cantidad protestada. El Procurador General representará al Tesorero de Puerto Rico en tales pleitos. Una vez radicada la demanda, si se radicase en una corte insular, se tramitará de acuerdo con los procedimientos, términos y demás requisitos establecidos por el Código de Enjuiciamiento Civil, para una acción ordinaria. Una vez listo cualquier caso para juicio, el tribunal señalará día para la vista, a petición de cualquiera de las partes, con preferencia a cualquier otro asunto pendiente ante el mismo. Una vez que se dicte sentencia final, si ésta fuese favorable al contribuyente, el Tesorero de Puerto Rico procederá a reintegrar la suma que se ordene en la sentencia con cargo a cualquier fondo existente en Tesorería no destinado a otras atenciones, más los intereses sobre tal cantidad a razón del seis (6) por ciento anual, computados desde la fecha de la radicación de la demanda ante la corte; o a instancia del contribuyente, deberá el Tesorero acreditar al contribuyente el montante total de la cantidad a reintegrar, para ser aplicada al pago de cualquier contribución ya vencida y no satisfecha, o por vencerse en el futuro; *Disponiéndose,* que dicho crédito podrá ser transferido por el contribuyente y entonces el Tesorero de Puerto Rico acreditará el mismo a los cesionarios a todos los efectos de la ley. Las costas, desembolsos y honorarios de abogado se impondrán a discreción de la corte en la misma forma que en las demás acciones civiles."

Tenía, pues, a su alcance un recurso adecuado, rápido y eficaz. No había daños irreparables. Tampoco multiplicidad de procedimientos. Si el pleito no se resolvía dentro del año económico, bastaría repetir el pago bajo protesta cuando la fecha llegara e iniciar el pleito que quedaría resuelto por la regla sentada en el primero. Ése no es el caso de multiplicidad a que la jurisprudencia se refiere.

Y en segundo lugar el derecho alegado al no pago de la contribución es a lo sumo dudoso y los hechos presentan al peticionario no como la víctima de un error, ilegalidad o abuso por parte del Tesorero, sino como a un litigante que sabe y puede defenderse.

Por una suma de cien dólares mensuales recibió en arrendamiento diez mil setecientos metros cuadrados de terreno en la isleta de San Juan, al lado de un Parque, para explotar un negocio lucrativo por un período de quince a treinta años con la garantía de que las obras de carácter permanente que sobre las tierras levantara sólo pasarían a la propiedad de su arrendador mediante el pago de su valor.

No comenzó a satisfacer el canon en seguida. Tuvo un año libre por el contrato para iniciar sus trabajos y luego se aprovechó de algunas dificultades surgidas más bien aparentes que reales para pedir que se le reintegrara lo que empezó a pagar y obtuvo el reintegro, y provocando por medio de una carta hábil una contestación que se presta a interpretaciones, parece que continuó sin pagar no obstante confesar por medio de su apoderado en corte abierta que había subarrendado su negocio por un canon anual veinte veces mayor que el que debía satisfacer por las tierras.

Y cuando el arrendador, que lo fué El Pueblo de Puerto Rico por su Comisionado del Interior, le impuso y cobró por medio de su Tesorero por la propiedad que sobre la tierra tenía la misma contribución que paga cualquier otro propietario en la isla, rehusó, negando el título del Pueblo que

lo puso en posesión, que lo ha mantenido en ella sin perturbación alguna, que le ha permitido establecer y desenvolver su negocio y beneficiarse del mismo. Y no sólo adoptó tal actitud si que pidió el amparo de la jurisdicción de equidad de las cortes pasando por encima del procedimiento regular fijado por ley para todos los contribuyentes que consideren que se le cobra una contribución indebida.

No hay duda alguna que las tierras sobre las cuales se levantan las propiedades de que se trata formaron parte de la Reserva Federal, pero tampoco la hay que El Pueblo de Puerto Rico obtuvo la propiedad y posesión de las mismas a virtud de un contrato de permuta que celebrara con las autoridades federales, estando solamente pendiente a la fecha del contrato la ultimación del título que finalmente fué otorgado a virtud de ley federal aprobada en abril 26, 1938, 75th Cong., 3d Sess. Ch. 176, 52 Stat. 247.

Y siendo ésa la realidad de los hechos cuando el contrato se celebró, durante todo el tiempo que el demandante disfrutó como sigue disfrutando de los derechos íntegros que el contrato le concediera, sin perturbación alguna, y ahora, no es necesario siquiera entrar a considerar la jurisprudencia que se cita sobre el extremo de que la isla no podía imponer contribuciones a propiedades situadas en reservas federales, sobre todo cuando no estamos considerando el caso para resolverlo en definitiva, sino para decidir que no es uno tan claro y extraordinario que justifique la expedición del *injunction*.

*Por las anteriores razones y por otras que podrían fácilmente aducirse, procede la revocación de la sentencia apelada, dictándose, en su lugar, otra desestimando la solicitud, con costas.*

El Juez Asociado Sr. De Jesús no intervino.